**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:11-CV-00172**

| | |
|---|---|
| WINTHROP RESOURCES CORPORATION,      ) ) ) **Plaintiff/Counter-Defendant**   ) ) **v.**          ) ) COMMSCOPE, INC. OF NORTH CAROLINA,      ) ) ) **Defendant/Counter-Claimant**   ) ) | **MEMORANDUM AND ORDER** |

**BEFORE THE COURT** are cross-motions for summary judgment filed by Winthrop Resources Corporation ("Winthrop") and Commscope, Inc. of North Carolina ("Commscope"). (Docs. 61, 62). Each party has filed a response and a reply. (Docs. 64-67). For the reasons stated below, the Court **GRANTS** Winthrop's Summary Judgment Motion in its entirety and **DENIES** Commscope's Summary Judgment Motion.

I.     PROCEDURAL HISTORY

This case commenced on December 1, 2011, upon the filing of Winthrop's Complaint seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202. Winthrop seeks a declaration that the Commencement Date of Lease Schedule 001R is October 1, 2008 and obligates Commscope to make thirty-six (36) monthly lease payments in the amount of $200,763 each and that Commscope is not entitled to a refund of money paid. Further, Winthrop seeks attorneys' fees.

This Court granted Winthrop's motion to dismiss several counter-claims filed by Commscope (Doc. 25), and Commscope ultimately filed a Second Amended Answer. (Doc. 48). Commscope pled twelve affirmative defenses, namely:

1. Winthrop's Complaint fails to state a cause of action;
2. The contract is ambiguous and extrinsic evidence shows that Commscope's view is correct
3. Commscope has paid the entire amount due under the contract
4. The Lease does not allow Winthrop to collect attorneys fees
5. Applicable law does not allow recovery of attorneys fees in the absence of statutory authority
6. General equitable principles bar Winthrop's claim for attorneys fees as well as principles addressing the size and composition of a reasonable free
7. Winthrop's claims are barred by the inequitable conduct of wrongly collecting sales tax on Commscope's SAP software licenses
8. If the Court finds that Winthrop was permitted to collect taxes, Winthrop should have taken steps to prevent Commscope from paying double the amount of taxes necessary and should have sought reimbursement from the North Carolina taxing authority
9. Any amount the Court may find that Commscope owes to Winthrop should be offset by the down payment made and the amount Commscope overpaid Winthrop for taxes
10. Winthrop modified the contract after the Lease was created
11. Waiver
12. Reliance

(Doc. 48, 8-15). Further, Commscope asserted two counterclaims alleging that it is entitled to amounts it claims were overpaid. These claims are (1) breach of contract; and (2) breach of a modified contract.

## II.     FACTUAL BACKGROUND

The parties have signed three documents integral to the instant dispute. They are entitled Lease Agreement ("Lease"), Lease Schedule No. 001, and Lease Schedule No. 001R.

The Lease is dated January 28, 2008. (Doc. 1-1, at 2). Commscope signed the Lease on January 28, 2008 and Winthrop signed on January 30, 2008. (Doc. 1-1). The Lease purports to grant Commscope, the lessee, the right to use certain hardware and software as described on Lease Schedules. (Doc. 1-1, at 2).

There are two Lease Schedules signed by the parties, No. 001 and No. 001R. Both incorporate the terms of the Lease by reference. (Doc. 1-2, Doc. 1-7). Lease Schedule No. 001 was signed by the parties on the same dates as the Lease. It states as follows:

> Term of Lease from Commencement Date: 36 months
> Monthly Lease Charge: January – September 2008: $0.00 per month;
> Thereafter: $198,883.00 per month.
> Anticipated Delivery and Installation: January – February 2008

(Doc. 1-2). Under Lease Schedule No. 001 Commscope agreed to lease a minimum of $4,801,735.00, with $300,000.00 of the minimum being hardware. (*Id.*). Further, under "Equipment Description"[1] it lists SAP[2] Software Licenses and Technology-Related Hardware. (*Id.*).

Lease Schedule No. 001R was executed by Commscope on October 14, 2008 and Winthrop on October 15, 2008. (Doc. 1-7, at 2). It provides that "[t]his Lease Schedule No. 001R replaces Lease Schedule No. 001." (*Id.*). It states as follows:

> Term of Lease from Commencement Date: 36 months
> Monthly Lease Charge: January – September 2008: $0.00; Thereafter: $200,763.00.

Commscope was required to lease $5,052,323.85 in Equipment, with at least $447,232.34 of total being hardware.

Sections 1 and 2 determine when any schedule for the Lease commences. (Doc. 1-1, §§ 1-2). Section 3 defines and describes Lease Charges. (Doc. 1-1, § 3).

The Lease also has specific provisions governing taxes, (Doc. 1-1, § 4), and attorneys' fees, (Doc. 1-1, § 18).

---

[1] The term "Equipment" includes Hardware, Software, and Services. (Doc. 1-1, at 2).
[2] "SAP" refers to entity known as "SAP SE" a European Company dealing in software and software-related services.

The parties stipulated that the Lease and any Schedules "shall be governed by the internal laws (as opposed to the conflicts of law provisions) and decisions of, the State of Minnesota." (Doc. 1-1, § 25).

III.    STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1);  *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same).  A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.   In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party.  *Celotex Corp.*, 477 U.S. at 325.

When considering cross-motions for summary judgment, a court "consider[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defenders of Wildlife v. North Carolina Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)).  In considering these motions, the court will "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (quoting *Rossignol v. Voorhar*, 316 F.3d 516, 523 (4th Cir. 2003)).

IV.     DISCUSSION

        A.      Claims Involving Lease Charges

The parties have competing views on whether Commscope is obligated to pay thirty-six months or twenty-seven months of Lease Charges under the Lease and Lease Schedule No. 001R.  Therefore, the Court will examine the Lease and Schedule No. 001R, keeping in mind that Minnesota law governs its interpretation.

"When the language of a contract is clear and unambiguous, [the court] enforce[s] the agreement of the parties as expressed in the contract."  *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 832 (Minn. 2012).  "If the language is ambiguous – that is, susceptible to more than one reasonable interpretation – parol evidence may be considered to determine the intent of the parties."  *Id.*  Determining ambiguity is a question of law for the court to decide.  *Id.*

Section 1 of the Lease provides that:

> The term of this Agreement, as to all Equipment designated on any particular Lease Schedule, shall commence on the Installation Date for all Equipment on such Lease Schedule and shall continue for an initial period ending that number of months from the Commencement Date as set forth is such Lease Schedule.

The Installation Date "for each item of Equipment shall be the day said item of Equipment is installed at the location of installation as designated on the applicable Lease Schedule (the "Location of Installation"), ready for use, and accepted in writing by the Lessee." (Doc. 1-1, § 2).  Lease § 2 specifically provides that "[t]he Commencement Date for any Lease Schedule is the first of the month following the latest Installation Date of all the Equipment on the Lease Schedule."  (Doc. 1-1, § 2).  Commscope was required to "complete, execute, and deliver a Certificate of Acceptance to [Winthrop] upon installation of the equipment." (*Id.*).

Therefore, the Lease commenced once Commscope accepted the last piece of Equipment identified on Attachment A of Lease Schedule No. 001R and provided a Certificate of

Acceptance. *Winthrop Resources Corp v. Sabert Corp.*, 567 F. Supp. 2d 1084, 1087 (D. Minn. 2008).[3] On October 14, 2008, Commscope signed the latest Certificate of Acceptance stating that all the equipment on Schedule A "(i) have been received; (ii) are in good working order; (iii) have been tested and inspected; (iv) are satisfactory in all respects; and (v) are acceptable for use." (Doc. 1-6). The Certificate stated that "all of the items of equipment on the attached Schedule A were installed on the following date: 9-30-08 (the 'Installation Date.')." (*Id.*). Accordingly, the terms of Lease unambiguously provide that the Commencement Date of the Lease is October 1, 2008.

The next step is determining how long Commscope must pay the Lease Charge. The following clause of Lease Schedule No. 001R governs:

> Term of Lease from Commencement Date: 36 months
> Monthly Lease Charge: January-September 2008: $0.00; Thereafter: $200,763.00
> Anticipated Delivery and Installation: February – September 2008

Commscope urges the Court to interpret "Monthly Lease Charge: January – September 2008: $0.00; Thereafter: $200,763.00" to mean "Monthly Lease Charge: nine months: $0.00; Thereafter: $200,763.00." This interpretation is at odds with the plain language of the contract.

Commscope argues that this clause is ambiguous and that the Court should resort to extrinsic evidence.

---

[3] Judge Schiltz provided a useful example:

> Suppose . . . that a computer monitor was installed (and ready for use and accepted in writing) on July 1, 2003. Sabert was obligated to *begin* making payments to Winthrop for the use of that monitor on July 1, 2003. To calculate the date on which Sabert's obligations with respect to the monitor *concluded,* one would have to first identify the lease schedule on which the monitor was listed, then identify the date on which the last piece of equipment on that lease schedule was installed (that is, the Commencement Date), and finally count forty-two months forward from the first of the month following that date.

*Winthrop Res. Corp. v. Sabert Corp.*, 567 F. Supp. 2d 1084, 1087 (D. Minn. 2008).

The first of Commscope's arguments is that § 25 and § 3 of the Lease are at odds with the Monthly Lease Charge in Schedule No. 001R. Section 25 is entitled "Miscellaneous" and the applicable portion reads as follows: "[t]he Monthly Lease Charge for each Lease Schedule is intended to be fixed from the Commencement Date to the end of the term applicable to such Lease Schedule." (Doc. 1-1, § 25). The applicable portion of § 3 states that "[t]he lease charges for the Equipment leased pursuant to this Lease Agreement shall be the aggregate 'Monthly Lease Charge(s)' as set forth on each and every Lease Schedule." (Doc. 1-1, at § 3).

Commscope argues that this clause creates an ambiguity because "each month of delay in Commencement Date that passed beyond January 2008, resulted in the loss of one $0.00 Monthly Lease Charge, and the addition of a $200,763 Monthly Lease." (Doc. 62-1, at 28). Commscope states that this is "contrary to Section 25 of the Lease" because "the 'aggregate' of 'Monthly Lease Charges' could vary and were not 'fixed.'" (*Id.*).

However, this is exactly what the contract requires. The term "fixed" means "[d]etermined; established; set" and "[n]ot subject to change or variation." Amer. Heritage Dict. 688 (3d ed. 1992). However, the term "fixed" does not exist in a vacuum in § 25, rather, "[t]he Monthly Lease Charge for each Lease Schedule is intended to be fixed *from the Commencement Date*." (Doc. 1-1, § 25) (emphasis added). As discussed earlier, the Commencement Date is subject to change and could vary depending on the latest Installation Date. It is only after this variable has been decided that the Monthly Lease Charge need be fixed. Further, the aggregate of the Monthly Lease Charges cannot be determined without reference to the "term of lease" clause. Therefore, a $200,763 Monthly Lease Charge will replace a $0.00 Lease Charge as months pass after January of 2008. The language of Schedule 001R evidences that both parties understood this to be because they only *anticipated* delivery and installation between the months

7

of February and September. (Doc. 1-7, at 2). Once the latest Installation Date occurs, the Monthly Lease Charges are not subject to change and may be "aggregate[d]" with certainty. Therefore, the Court declines to find an ambiguity based on this argument.

Commscope's second argument is that the phrase "thereafter" makes the Monthly Lease Charge clause in Schedule No. 001R ambiguous. (Doc. 64-1, at 11). Commscope argues that "[i]f 'thereafter' refers to September 2008, so that the $200,763.00 payments were to start in October 2008, the Lease would not say whether there are 27, 36, or some other amount of Monthly Lease Charges of $200,763.00 due." (*Id.*).

The Court finds no ambiguity. The term "thereafter" means "[f]rom a specified time onward; from then on." Amer. Heritage Dict. 1862. Accordingly, "from [September] onward" the Monthly Lease Charges were to be $200,763.00. However, as discussed above, Monthly Lease Charges cannot begin until the Commencement Date. The term of the Lease will always be thirty-six months from the Commencement Date because that is what Schedule 001R specifically provides. Accordingly, Commscope's argument is contradicted by language of the Lease.[4]

Commscope's last argument deals with the concept of "interim rent." "[T]he lease contemplates that there may be an interim period between the Installation Date of a particular item of equipment, which is the beginning of the lease term as to that item of equipment, and the

---

[4] Commscope also makes an argument that Winthrop, in prior lawsuits, has stated that the total "Lease Charge" is the aggregate of "Term of Lease from Commencement Date" multiplied by the "Monthly Lease Charge." (Doc. 64, at 11-12). However, all of the leases Commscope cites do not have a clause analogous to "January-September: $0.00; Thereafter: $200,763." Rather, they all had the same rate specified for every month. Accordingly, it was easy to create total lease charge by performing multiplication because the Commencement Date variable did not impact the total amount. In this case, the Commencement Date has such an impact. The fact that Monthly Lease Charges between January and September would have a value of $0.00 means that the total sum cannot be computed without regard to the Commencement Date. Therefore, the fact that Winthrop calculated the total differently in prior cases is of no import to the current issue before the Court.

Commencement Date applicable to that item of equipment." *Sabert*, 567 F. Supp. 2d at 1088-89. There are two clauses dealing with interim rent. Lease § 3 states that

> The Lease Charge for the period from the Installation Date to the Commencement Date (the "Installation Period") shall be an amount equal to the applicable "Monthly Lease Charge" divided by thirty (30) and multiplied by the number of days from and including the Installation Date.

(Doc. 1-1, § 3). Schedule 001R specifies that "[t]he Monthly Lease Charge will be prorated and charged as interim rent between the date an item of equipment is accepted and the Commencement Date." (Doc. 1-7).

Winthrop states that Commscope still received a benefit from the disputed clause because it was not able to charge interim rent. Commscope argues that Winthrop did not invoice the interim rent because it would have "alert[ed] Commscope to its scheme." (Doc. 62-1, at 28). Commscope claims that Winthrop is taking an inconsistent position from its prior litigation strategies and requests the Court to invoke the doctrine of judicial estoppel[5] to preclude Winthrop from doing so.

The doctrine of judicial estoppel is not applicable because Winthrop has not taken inconsistent positions. As Commscope's citations confirm, Winthrop has argued in the past that Interim Rent does not modify the Monthly Lease Charges. (*See* Doc. 62-1, at 27). However, this is not inconsistent with the fact that interim rent is created by multiplying the prorated amount against "an amount equal to the applicable "Monthly Lease Charge" divided by thirty (30) and

---

[5] "Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996). The doctrine will not be invoked unless three elements are met (1) the party sought to be estopped must be attempting to adopt a factual, as opposed to legal, position that is inconsistent with its stance taken in prior litigation; (2) "the prior inconsistent position must have been accepted by the court," *id.* at 224; and (3) the "party sought to be estopped must have intentionally misled the court to gain an unfair advantage," *id.* (quoting *Tenneco Chems. V. William T. Burnett & Co.*, 691 F.2d 658, 665 (4th Cir. 1982)).

multiplied by the number of days from and including the Installation Date." (Doc. 1-1, at § 3). It is evident that interim rent is derived, in part, from the applicable Monthly Lease Charge. The applicable Monthly Lease Charge from February to September 2008 was $0.00. Therefore, if a party were to attempt to charge interim rent during this time period they would have to multiply zero (zero divided by thirty is zero) by the prorated amount. The result will always be zero. Therefore, Winthrop had no right to invoice interim rent under the contract during this period. Accordingly, Winthrop's position is not inconsistent with its prior positions regarding interim rent and the Court will not invoke judicial estoppel.

B.    Commscope's Breach of Contract and Modification Theory

Commscope, in its counterclaim for breach of a modified contract, contends that an oral modification occurred prior to the execution of Lease Schedule No. 001R.

Minnesota "court[s] respect[] written contracts and subject[] allegations of an inconsistent oral contract to a rigorous examination." *Bolander v. Bolander*, 703 N.W.2d 529, 541-42 (Minn. Ct. App. 2005). Accordingly, the party asserting that there has been an enforceable oral modification of the terms of a written contract bears the burden of proving the modification by clear and convincing evidence. *Id.* at 541. "Both the existence and terms of an oral contract are issues of fact, generally to be decided by the fact-finder." *Rios v. Jennie-O Turkey Store, Inc.*, 793 N.W.2d 309, 315 (Minn. Ct. App. 2011).

The Court notes that the parties' agreement has a no oral modification clause. However, "a written contract can be varied or rescinded by oral agreement of the parties, even if the contract provides that it shall not be orally varied or rescinded." *Larson v. Hill's Heating and Refrig. of Bemidji, Inc.,* 400 N.W.2d 777, 781 (Minn. Ct. App.1987).

Here, the Court finds that Commscope has not provided sufficient evidence for a reasonable jury to conclude, under the clear and convincing evidence standard, that an oral modification occurred. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986) ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.").

The evidence presented regarding the oral modification involves Commscope's assertion that the parties orally agreed to a $200,000 addition to the Lease in spring of 2008. Commscope asserts that several Winthrop representatives admit that an oral agreement occurred but the undersigned has not found these admissions in the transcripts submitted. Rather, the transcripts show that the parties entered into *discussions* involving the addition of new equipment which culminated in the signing of Schedule 001R. Brian Slipka, Winthrop's representative to Commscope, communicated to Kap Kim, Commscope's former Vice President and Chief Information Officer, that the lease factor and cost factor of Schedule No. 001 would remain the same if Winthrop added more equipment. (Doc. 62-1, App'x C, Slipka Dep., at 72, 103-104). Commscope cites to the deposition of Kap Kim in order to prove acceptance. However, his testimony indicates that a deal had not been reached until the parties executed the revised schedule.

Moreover, representations made by Winthrop, even if sufficiently definite to amount an offer, were not accepted as shown by emails sent between Slipka and Kim in June and September of 2008.

On June 12, 2008, Slipka emailed Kim about the hardware shortfall and the fact that ordering the hardware would exceed the total amount on the lease. (Doc. 61-6). He stated that he received approval to accept the additional cost to meet the hardware limit and that the

adjusted payments, once they begin in October, would use the same "cost factor." (*Id.*). Kim responded that he thought he had purchased more hardware than what Slipka represented and that he would get back to him.[6]

On September 26, 2008, Slipka sent Kap Kim an email stating that "[w]e will be sending out today the final CofA for Kap's signature – which reflects the actual dollar amounts funded and overall hardware content." (Doc. 61-7). The email also states that "we used the same lease factor to keep everything consistent with what we agreed to in January." (*Id.*). Kim's response, dated September 26, was that he received the package and "forwarded to Barry for his review. Barry is on vacation for next week and so will be delayed for delivery." (*Id.*).

These emails show that no modification was made apart from Schedule 001R. No reasonable jury could find that clear and convincing evidence exists. Both parties are extremely sophisticated and have experience in negotiating leases such as this one. The Lease itself was heavily negotiated. The Lease, in § 25, specifically provides that modifications must be agreed to in writing and signed by an officer of Winthrop and Commscope. The parties showed that they understood this ostensible obligation[7] by complying with it when executing Schedule 001R. The parties' conduct and exchanges shows that no new deal had been agreed upon until they signed Schedule 001R.

As an additional ground for granting summary judgment as to the modification counterclaim and affirmative defense, the Court finds that the prior discussions between the parties, even if they amounted to a contract, merged into Schedule 001R. The representations are barred by the parol evidence rule.

---

[6] Commscope had yet to decide even how much hardware it was going to buy at this point. (Doc. 62-5, at 49).
[7] The Court does not mean to imply that the parties were incapable of modifying the contract without complying with § 25's mandate. As noted above, Minnesota law does not require compliance in order for the modification to be effective.

"Whether an agreement is completely integrated and not subject to variance by parol evidence is an issue of law." *Maday v. Grathwohl*, 805 N.W.2d 285, 284 (Minn. Ct. App. 2011) (quoting *Borgersen v. Cardiovascular Sys., Inc.*, 729 N.W.2d 619, 625 (Minn. Ct. App. 2007)). Lease Schedule No. 001R states that "[t]he terms of the Lease Agreement . . . are a part hereof and are incorporated by reference herein." (Doc. 1-7, at 2). Schedule 001R is a seven page document which is extremely detailed as to Equipment. The Lease is a seven page document with thirty separate sections. Also present is a merger clause which states that "This Lease Agreement and associated Lease Schedules(s) (including any riders thereto) constitute the entire understanding and agreement . . . superseding all prior agreements, understandings, negotiations, discussions . . . representations . . . and offers between the parties whether oral or written." *See Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minnesota*, 664 N.W.2d 303, 312 (Minn. 2003) ("A merger clause establishes that the parties intended the writing to be an integration of their agreement.").

Section 25 of the Lease also states that "[t]here are no unwritten or oral agreements between the parties." (*Id.*). Commscope argues that this clause is only relevant as of the date the Lease was signed in January of 2008. Neither party has directed the Court to a Minnesota case directly dealing with this issue. However, when a party incorporates a will by reference, it speaks as if it were set out fully therein. There is no reason to deviate from this here. *Fahey Bros. P'ship v. State of Minnesota*, No. 89281, 1980 WL 1049, at *4 (Minn. Tax Oct. 24, 1980) (prior lease incorporated by reference in new agreement speaks as of the date new agreement); *see also* 17A C.J.S. Contracts § 402 ("Matters incorporated into a contract by reference are as much part of the agreement as if they had been set out in the contract verbatim."); BLACK'S LAW DICTIONARY 766 (6th ed. 1990). It follows that the merger clause is not limited to January 2008

but bars consideration of extrinsic evidence prior to October of 2008, the date it was incorporated by reference. Therefore, evidence of prior agreements is substantively barred from being considered in the instant case. *Sabert Corp.*, 567 F. Supp. 2d at 1092-94 (finding that Schedule 001R and Lease are unambiguous and integrated and applying parole evidence rule).

Given that the Lease and Lease Schedule No. 001R are fully integrated and unambiguous, the parol evidence rule will bar any consideration of the prior discussions. "The parole evidence rule is not a rule of evidence, but a substantive rule of contract interpretation." *Maday v. Grathwohl*, 805 N.W.2d 285, 287 (Minn. Ct. App. 2011) (quoting *Danielson v. Danielson*, 721 N.W.2d 335, 338 (Minn. Ct. App. 2006)). "The parol evidence rule 'prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing." *Id.* (quoting *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003)). Therefore, "[w]hen parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement." *Id.* (quoting *Flynn v. Sawyer*, 272 N.W. 904, 907, 908 (Minn. 1978)).

"A prior oral agreement merges with and is integrated into the subsequent written agreement." *United Artists Commc'ns v. Corporate Prop. Investors*, 410 N.W.2d 39, 41 (Minn. Ct. App. 1987). Matters discussed in negotiations that do not make it into the final writing are considered waived or abandoned. *Id.* "[I[f a contract is a complete integration of the parties' agreements, prior agreements *within the scope of the contract* are discharged regardless of consistency." *Stromberg v. Smith*, 423 N.W.2d 107, 109 (Minn. Ct. App. 1988).

In *United Artists*, the Minnesota Court of Appeals examined a transaction where United Artists, as lessee, entered into a twenty-five year written lease agreement with a lessor. 410

N.W.2d at 40.  The lease provided that United Artists would pay $.20 per square foot per year to a merchant's association in the mall, "subject to annual upward adjustments approved by a two-thirds majority" of the association.  *Id.*  Between 1981 and 1982, the lessor and United Artists negotiated to modify the lease terms.  *Id.*  The parties discussed recently increased dues by the association and the ability to install video games in the leased space.  *Id.*  The parties then entered into a written modification of the original lease which allowed United Artists to install the games and increased the dues to $.30, but delayed the effective date of the increase.  *Id.* at 41. The written modification stated that the lease "as herein modified and supplemented, is in all other respects ratified and confirmed."  *Id.*  In 1985, the association again increased the dues and United Artists refused to pay by claiming that, during the discussions with the lessor, the parties orally agreed that there would be no increase over the $.30 per square foot.  *Id.*  The trial court held that (1) there was insufficient evidence of any oral modification and (2) any such oral modification would merge into the subsequent written modification.  *Id.* at 42.[8]  Particularly important regarding the issue of merger were clauses that the lease "contains the entire agreement between the parties" and that the written modification ratified and confirmed the original written lease.  *Id.*  Further, the parol evidence rule barred the consideration of contradictory terms to the upward adjustment clause, which had been reaffirmed in the written modification.  *Id.*

The Court finds that the situation in *United Artists* is similar to the case at bar.  Here, Winthrop and Commscope have one written agreement comprising of the Lease and Schedule 001 made in January of 2008.  Next, Commscope alleges that the parties made an oral agreement modifying the terms of the January 2008 agreement by asserting the existence of certain discussions.  Afterwards, the parties signed Schedule 001R which expressly supersedes and

---

[8] The Minnesota Court of Appeals affirmed only on the merger doctrine and the parol evidence rule.

modifies Schedule 001. Therefore, under *United Artists*, the prior alleged oral modification is deemed to have merged into the written agreement signed by the parties. Accordingly, the parole evidence rule stands as a separate ground for granting Winthrop Summary Judgment on Commscope's breach of contract counterclaim.[9]

### C. Commscope's Affirmative Defense of Good Faith and Reliance

Commscope claims that Winthrop breached the implied duty of good faith and fair dealing by preventing it from performing under the Lease 001. Lease Schedule No. 001 had a hardware requirement of $300,000. (Doc. 1-2, at 2). Lease Schedule No. 001R, the governing lease, has a requirement of $447,232.34. (Doc. 1-7, at 2). Commscope claims, by way of extrinsic evidence, that Winthrop overstated an alleged shortfall on the $300,000 hardware requirement and delayed in approving additional equipment.

In Minnesota, "every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995). "Bad faith is defined as a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties." *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998).

This defense fails for the same reasons Commscope's breach of contract and modification counterclaims fail. These representations and discussions all merged into the final agreement and are barred by the parol evidence rule. Commscope is attempting to use the implied duty of good faith and fair dealing to sue on Schedule 001. Schedule 001 is not the operative lease schedule and may not be sued upon because the parties agreed that Lease Schedule 001R

---

[9] The parol evidence rule also bars consideration of Winthrop's internal memoranda, such as the ST forms, and other extrinsic evidence advanced by Commscope.

replaced it. (Doc. 1-7, at 2). Given that Schedule 001 is not the governing instrument, its terms do not provide a basis for a suit involving the duty of good faith and fair dealing. "[A]n enforceable contract must exist before the duty of good faith and fair dealing can be implied by law into it." *Cox v. Mortgage Elec. Registration Sys., Inc.*, 685 F.3d 663, 670 (8th Cir. 2012); *see also Beer Wholesalers, Inc. v. Miller Brewing Co.*, 426 N.W.2d 438, 441-42 (Minn. Ct. App. 1988) (breach of implied duty of good faith and fair dealing may not be based off letter that does not amount to agreement between parties); *Capital Bank v. Sorenson*, *Capital Bank v. Sorenson*, No. C4-90-1122, 1990 WL 211991, at *1 (Minn. Ct. App. Dec. 24, 1990) (unpublished) ("The implied covenant of good faith and fair dealing . . . only extends to the performance of actions within the scope of the written agreement between the parties.").

### D.     Taxation

Winthrop also moves for summary judgment on Commscope's counterclaim regarding payments of tax. Commscope's counterclaim alleges that Winthrop wrongly billed Commscope for taxes attributable to the SAP software licenses and that Winthrop should have sought a refund from the appropriate taxing authorities. (Doc. 48, ¶¶ 107-08).

The Lease addresses taxes in § 4. Section 4 provides that:

> In addition to the Lease Charges set forth in Section 3, the Lessee shall reimburse the Lessor for all license or registration fees, assessments, sales and use taxes . . . gross receipts taxes, personal property taxes and other taxes or fees now or hereafter imposed by any government, agency, province or otherwise upon the Equipment, the Lease Charges or upon the ownership, leasing, renting, purchase, possession, use, recycling or disposal of the Equipment, whether the same be assessed to Lessor or Lessee (the "Taxes").

Section 4 also states that

> Lessee, upon notice to Lessor, may, in Lessee's own name, contest or protest any Taxes, and Lessor shall honor any such notice except when in Lessor's reasonable and good faith opinion such contest is futile or will cause a levy or lien to arise on the Equipment or cloud Lessor's title thereto.

The facts show that the SAP licenses were contracted for, invoiced, and received on or before January 30, 2008, which is the date Winthrop signed the Lease. (*See* Doc. 1-1, § 25, "This Lease Agreement shall not become effective until delivered to Lessor at its offices at Minnetonka, Minnesota and executed by Lessor."). Commscope was invoiced for the software on January 29, 2008. (Doc. 61-17, at 3). However, SAP did not receive payment or a certificate of acceptance until after the Lease was signed. (Doc. 62, App'x B, Ex. 90) (dated February 4, 2008). The terms of payment were stated as follows: the license fees of $4,401,765.00 were paid from a "financing arrangement" with Winthrop and the taxes related to the licenses, $301,486.53, were paid by Commscope.

The parties dispute how to interpret of the applicable statutes governing sales and use taxes in North Carolina.

North Carolina imposes a privilege tax on a retailer's net taxable sales or gross receipts, depending on what is sold. N.C. Gen. Stat. § 105-164.4(a). The general rate of tax applies to the sales price of retail sales of tangible personal property, unless a specific provision covers the item. § 105-164.4(a)(1).

A "sale" is "[t]he transfer for consideration of title, license to use or consume, or possession of tangible personal property or digital property or the performance for consideration of a service." N.C. Gen. Stat. § 105-164.3(36). The term "sale" includes "[a] lease or rental." § 105-164.3(36). A "lease" is "[a] transfer of possession or control of tangible personal property for a fixed or indeterminate term for consideration" subject to certain exceptions not relevant here. N.C. Gen. Stat. § 105-164.3(17). This definition of "lease" should be used regardless "if a transaction is characterized as a lease or rental under generally accepted accounting principles, the Internal Revenue Code, or other provisions of federal, state, or local law." N.C. Dep't of

18

Revenue, Sales and Use Technical Bulletins, Section 23-1 (Apr. 1, 2007) *available at* http://www.dor.state.nc.us/practitioner/sales/bulletins/.

A retail sale is a "sale, lease, or rental for any purpose other than for resale, sublease, or subrent." § 105.164.3(34). The same rate used to tax the sale of tangible personal property is used to calculate the tax for leases and is applied to the "gross receipts derived from the lease . . . of tangible personal property by a person who is engaged in business of leasing." § 105-164.4(a)(2); 17 N.C. Admin. Code 7B.4401. The lessor is also required to "collect the tax imposed by this section on the separate retail sale of the property." § 105-164.4(a)(2). "The tax is due and payable at the time the lessor bills the lessee for the rent whether such billing is for the lump sum rental or on a monthly or other periodic basis." 7B.4401.

The term "gross receipts" is given the same meaning as sales price. § 105.164.4. Therefore, the "gross receipts" of an item are "[t]he total amount or consideration for which tangible personal property . . . [is] sold, leased, or rented." N.C. Gen. Stat. § 105-164.3(37). It does not include "[i]nterest, financing, and carrying charges from credit extended on the sale, if the amount is separately stated on the invoice, bill of sale, or a similar document given to the consumer." § 105-164.3(37)b.2.

The SAP licenses are "tangible personal property" because they are "prewritten computer software" that is "perceptible to the senses." N.C. Gen. Stat. § 105-164.3(46). The computer hardware is also tangible personal property.

It appears to the Court that, if the transaction were constructed appropriately, there would only be a single payment of sales tax on the SAP licenses. If the SAP transaction were treated as a sale from SAP to Winthrop, it would be a sale for resale which would be a non-taxable event. Therefore, when Winthrop leased the licenses to Commscope, there would be taxes imposed

because the transaction would qualify as a retail sale. However, if the sale were made directly to Commscope, Commscope would be responsible for paying the sales tax. In this situation, Winthrop would be seen as a financer and the money given pursuant to the financing arrangement would not qualify as "tangible personal property."

Instead of choosing either arrangement, the parties decided to include the SAP licenses in an agreement entitled "Lease Agreement" and with hardware that was given as an otherwise valid "lease" under North Carolina tax law. Further, the Lease and Schedule No. 001R do not allocate payments for the SAP licenses and hardware. They also do not allocate financing charges. There is only a set Lease Charge. The Court notes that this transaction does not amount to a bundled transaction because it is "[a] sale of two or more products whose combined price varies, or is negotiable, depending on the products the purchaser selects." *See* N.C. Gen. Stat. § 105-164.3(1b). As made apparent by the parties' course of dealing, the final price is subject to change and is negotiable based on the amount of software and hardware Commscope selects.

The issue is whether, under the facts as stated above, the North Carolina Sales and Use Act ("Act"), N.C. Gen. Stat. § 105.164.1 *et seq.*, mandates the additional taxes collected by Winthrop from Commscope. "The burden of showing exemptions or exceptions from taxing statutes is upon the one asserting the exemption or exclusion." *Telerent Leasing Corp. v. High*, 174 S.E.2d 11, 15 (N.C. Ct. App. 1970).

A respected commentator on state taxation opines that "[a]s a general rule of sales and use law and administration, if a single transaction has a taxable and nontaxable component, the charge for the nontaxable component will be treated as nontaxable only if the consideration paid for it is separately stated on the customer's bill or invoice." Walter Hellerstein, *The Separate Statement Rule*, STATE TAXATION ¶ 17.12 (3d ed. 2014). This rule minimizes disputes over the

allocation of taxes, such as the instant one, and reflects the "general rule that taxpayers are bound to the form of their transactions." *Id.*

Winthrop cites to the case of *Rent-a-Car Co., Inc. v. Lynch*, 259 S.E.2d 564 (N.C. 1979) to establish that two payments of tax are appropriate in this case. In *Rent-a-Car*, the plaintiff was a corporation that rented and leased automobiles. *Id.* at 565. The dealer collected sales tax on the lease of vehicles but did not do so for the ultimate sale of the vehicles to the lessees. *Id.* The Supreme Court of North Carolina held that leases and sales are separately taxable events and that an exemption did not apply. This case has no bearing on the facts before the Court. The Court recognizes that leases and sales are separately taxable events. This case does not clarify whether the arrangement between Commscope and Winthrop amounts to a lease that required payment of taxes.

Winthrop also cites to the definition of gross receipts and *Sperry Corp. v. Lynch*, 332 S.E.2d 757 (N.C. Ct. App. 1985) for the proposition that the payments made on the SAP licenses "derive from" the Lease itself and therefore are taxable. In *Sperry*, the plaintiff taxpayer sought to reverse the judgment of the Superior Court which found that payments for maintenance charges derived from the lease of machines and were taxable. *Id.* at 757. If the lessees refused the maintenance portion of the lease, the plaintiff would not have leased the machines at all. *Id.* The Court of Appeals found that the sole issue was whether the payments the plaintiff received were "derived from the lease or rental of tangible personal property" and concluded that they were. *Id.* at 758 (quoting N.C. Gen. Stat. § 105-164.4(a)(2)). The court reasoned that "[t]he maintenance payments Sperry received were made because its leases required the lessees to make them; if the payments had not been made the lease agreements would have been broken." *Id.* Further, it was immaterial that the charges were separately stated, "the obligation to pay both

charges was established by the leases." *Id.* Accordingly, the court found that "the maintenance payments . . . were part of the gross proceeds *derived* from the renting of machines and equipment." *Id.*

Here, the Court need not determine whether the payments from the SAP licenses were "derived from" the payments from the lease of the hardware. This is because the "gross receipts" of the hardware are "[t]he total amount or consideration" received. N.C. Gen. Stat. § 105-164.3(37). The total amount received as consideration for the lease of the hardware amounts to the entire Lease Charge because the payments are not separately stated. Accordingly, the gross receipts include the entire amount of the Lease Charges, consistent with the separate statement rule as articulated by Hellerstein. Therefore, Winthrop is granted summary judgment on Commscope's claims and affirmative defenses involving tax issues.[10]

E.    Attorneys' Fees

The parties dispute whether § 18 of the Lease gives Winthrop the ability to collect attorneys' fees.[11] Section 18 provides that:

> In the event of any default, claim, proceeding, including a bankruptcy proceeding, arbitration, mediation, counter-claim, action (whether legal or equitable) appeal or otherwise, whether initiated by Lessor or Lessee . . . which arises out of, under, or is related in any way to this Lease Agreement, any Lease Schedule, or any other document, agreement or instrument executed pursuant hereto or in connection herewith, or any governmental examination or investigation of Lessee, which requires Lessor's participation (individually and collectively, the "Claim"), Lessee, in addition to all other sums which Lessee may be called upon to pay under the provisions of this Lease Agreement, shall pay to Lessor, on demand, all reasonable and documented costs, expenses, and fees paid or payable in connection with the Claim, including, but not limited to, reasonable and documented attorneys' fees and out-of-pocket costs, including travel and related expenses incurred by Lessor or its attorneys.

---

[10] Given this conclusion, the Court need not determine what weight, if any, should be given to the advisory letter of the Department of Revenue.

[11] The Court notes that Winthrop has cited several cases where it was awarded attorneys' fees pursuant to § 18 of a lease agreement. *See Winthrop Resources Corp v. Sabert Corp.*, 567 F. Supp. 2d 1084, 1087 (D. Minn. 2008); *Winthrop v. Diamond Home*, 2001 WL 436118, at *3 (D. Minn. Apr. 24, 2001), *All-Luminum Products v. Winthrop*, 28 Fed. App'x. 611, 612 (8th Cir. 2002). Only *Sabert*'s Lease agreement is available via PACER. The Lease language in §18 of the lease in *Sabert* is the same as § 18 in the instant case. (0:07-cv-0735, Doc. 1, Ex. A., § 18).

Commscope contends that because Winthrop was not "required" to bring the action, it is not entitled to attorneys' fees under § 18. However, that is not what the plain language of § 18 mandates. Section 18 explicitly covers any proceeding "whether initiated by Lessor or Lessee." Moreover, § 18 does not mandate that Winthrop be "required" to bring the action, but rather the action requires Winthrop's participation. This lawsuit requires Winthrop's participation because Winthrop filed it.

"The general rule in Minnesota is that 'attorney fees are not recoverable in litigation unless there is a specific contract permitting or a statute authorizing such recovery.'" *Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 554 (Minn. 2008) (quoting *Barr/Nelson, Inc. v. Tonto's Inc.*, 336 N.W.2d 46, 53 (Minn. 1983)). In *Oleisky*, the Minnesota Court of Appeals rejected the contention that a contract must only provide for attorneys' fees to the prevailing party and looked to the contract to determine how to award fees. 398 N.W.2d 627, 629-30. Accordingly, it was proper for the trial court to award a lender attorneys' fees even though it failed to lift a bankruptcy stay as part of its foreclosure efforts. *Id.*

However, "[w]here a litigant 'is not a prevailing party . . . and considerations of public policy militate against awarding attorney fees to a nonprevailing party' the court will not award attorneys fees." *Schmit Towing, Inc. v. Frovik*, No. A12-0989, 2012 WL 6652637, at *6 (Minn. Ct. App. Dec. 24, 2012) (unpublished) (quoting *Jadwin v. Kasal*, 318 N.W.2d 844, 848 (Minn. 1982)). "A prevailing party is one who prevails 'on the merits in the underlying action,' not one who 'was successful to some degree.'" *Id.* (quoting *Elsenpeter v. St. Michael Mall, Inc.*, 794 N.W.2d 667, 673 (Minn. App. 2011)). "Generally the payment of damages or the award of some other kind of performance is required to be deemed the prevailing party." *Id.* (citing *Hewitt v. Helms*, 482 U.S. 755, 760 (1987)). First, the Court finds that Winthrop is the prevailing party in

the current litigation because it was successful in its arguments related to the Lease Charges and taxation. The Court notes that damages were not awarded to Winthrop. However, the *Helms* case refers to the award of "declaratory judgment" as something that may qualify as relief for a prevailing party. Secondly, the Court finds that it is not inequitable to award damages. Winthrop prevailed in the instant action. The filing of the instant action may not have been "required" as stated by Winthrop's president, but it was responsive to the threatening position taken by Commcope.

Commscope also argues that enforcing the attorneys' fee provision would violate fundamental North Carolina public policy. North Carolina choice of law governs this case. *See In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205 (4th Cir. 1988) (in a diversity action a federal court applies the choice of law rules of the state in which it sits). North Carolina generally enforces provisions in contracts requiring that the substantive laws of another jurisdiction shall govern the interpretation of the contract. *Tanglewood Land Co. v. Byrd*, 261 S.E.2d 655 (N.C. 1980).

However, North Carolina courts may refuse to give effect to a choice of law provision where "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Broadway & Seymour, Inc. v. Wyatt*, No. 91-2345, 1991 WL 179084, at *3 (4th Cir. Oct. 28, 1991) (quoting Rest (2d) of Conflict of Laws § 187(2) (1971)); *see also SAS Inst. Inc. v. World Programming Ltd.*, No. 5:10-CV-25-FL, 2014 WL 6978300, at *14 (E.D.N.C. Sept. 29, 2014).[12]

---

[12] There is no dispute that Minnesota has a sufficient interest in the litigation under § 187(2)(a) because Winthrop is a domiciliary of Minnesota. *See* Rest. § 187(2) cmt. f.

As an initial matter, North Carolina law would not be the state of the applicable law in the absence of the choice of law provision. "[F]or a contract to be made in North Carolina, the final act necessary to make it a binding obligation must be done" in North Carolina. *Thomas v. Overland Exp., Inc.*, 101 N.C. App. 90, 96, 398 S.E.2d 921, 925 (1990). This is known as the "last act" test. *Id.* The lease provided that "[t]his Lease Agreement shall not become effective until delivered to Lessor at its offices at Minnetonka, Minnesota and executed by Lessor." (Doc. 1-1, §25). Accordingly, a condition precedent to contract formation was the signing in Minnesota. Therefore, the last act was not made in North Carolina.

Further, allowing attorneys' fees in this instance would not violate a fundamental policy of North Carolina. "To render foreign law unenforceable as contrary to public policy, it must violate some prevalent concept of good morals or fundamental principle of natural justice or involve injustice to the people of the forum state." *Boudreau v. Baughman*, 368 S.E.2d 849, 857-58 (N.C. 1988). "This public policy exception has generally been applied in cases such as those involving prohibited marriages, wagers, lotteries, racing, gaming, and the sale of liquor." *Id.* "[T]he issue of a party's entitlement to attorney fees is a question of substantive law." *Tolaram Fibers, Inc. v. Tandy Corp.*, 375 S.E.2d 673, 676 (N.C. Ct. App. 1989). In *Pinnacle Group, Inc. v. Shrader*, 412 S.E.2d 117, 173-74 (N.C. Ct. App. 1992), the North Carolina Court of Appeals upheld the award of attorneys' fees under an arbitration agreement that specified that New York law would govern. A party argued that North Carolina law[13] would not allow attorneys' fees in that instance. *Id.* However, the Court of Appeals upheld, under the deferential Federal Arbitration Act standard, the award of attorneys' fees by the arbitrators because New York law was allowed to apply. *Id.* The same party challenged the trial court's award of

---

[13] Although the Court of Appeals did not make this specific finding, the discussion is predicated on the assumption that North Carolina law would have otherwise governed.

additional attorneys' fees as again violating North Carolina law. *Id.* at 174-75. The Court of Appeals again upheld the determination under New York law. *Id.*

The Court notes that North Carolina has recently allowed commercial parties more latitude in negotiating business contracts and allows attorneys' fees provisions so long as they are reciprocal. N.C. Gen. Stat. § 6–21.6.[14] However, this statute does not apply to the instant case because the provision at hand is not reciprocal and the statute on its face only applies to contracts entered after October 1, 2011. This statute does represent that commercial parties are treated differently than consumers for purposes of attorneys' fees clauses in North Carolina.

Therefore, while North Carolina has a well-established policy of refusing to award attorneys' fees in the absence of statutory authority, *Stillwell Enterprises, Inc. v. Interstate Equip. Co.*, 266 S.E.2d 812, 814 (N.C. 1980), this policy is not sufficiently fundamental as to override the express will of sophisticated commercial parties who, represented by counsel, agree to a choice of law provision and an attorneys' fees provision that clearly establishes their respective rights.[15]

**IT IS, THEREFORE, ORDERED THAT**

    (1) Winthrop's Motion for Summary Judgment is **GRANTED**;

    (2) Commscope's Motion for Summary Judgment is **DENIED**;

---

[14] Also, attorneys' fees would not allowed under N.C. Gen. Stat. § 6-21.2. North Carolina courts have determined that the statute "allows (1) the party owed the debt (2) to recover attorney's fees (3) after the debt has matured (4) provided it in written in the note, conditional sale contract, or other evidence of indebtedness." *Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.,* 545 S.E.2d 745, 752, *aff'd,* 556 S.E.2d 293 (N.C. 2001). A lease may qualify as "evidence of indebtedness" for the purposes of § 6-21.2. *See Stillwell Enterprises, Inc. v. Equipment Co.*, 266 S.E.2d 812, 817-818 (N.C. 1980). First, this is not a suit on a debt, as contemplated by § 6-21.2. Secondly, § 18 provides for payment of reasonable fees and costs. Section § 6-21.2(2) states that if the writing uses such terminology, it "shall be construed to mean fifteen percent (15%) of the 'outstanding balance' ow[ed]." The outstanding balance is "the principal and interest owing at the time suit is instituted." Sec. 21.2(3). There is no principal and interest owing. Therefore, § 6-21.2 does not provide a basis for attorney's fees. *Monsato Co. v. ARE-108 Alexander Rd., LLC,* No. 1:10CV898, 2014 WL 2815778, at *5 (M.D.N.C. June 23, 2014) (suit for declaratory relief where no debt owed provides no basis for application of § 6-21.2).

[15] This holding is limited to agreements between commercial parties.

(3) The parties will address the issue of the amount and reasonableness of the attorneys' fees as follows:

    a. Winthrop shall submit its Motion for Attorneys' Fees, including all documentation in support of the amount and reasonableness of its attorneys' fees, within fourteen (14) days of this Order;

    b. Commscope may file its Response to the motion within fourteen (14) days of the date on which the motion is served in accordance with Local Rule of Civil Procedure 7.1(E); and

    c. Winthrop may file a Reply within seven (7) days of the date on which the Response is served in accordance with Local Rule of Civil Procedure 7.1(E).

Signed: February 10, 2015

Richard L. Voorhees
United States District Judge